Good morning everyone. Lovely to have you here and even more lovely to have you here. Judge Sykes and I are honored and privileged to have Judge Andrea Wood of the United States District Court for the Northern District of Illinois sitting with us by designation. Thank you for being here. Thank you. Okay all right we will we will begin and we will begin with case number 14-2665 Continental Casualty v. Symons and it's Mr. Abel. Good morning Mr. Abel. Come on up. Come on. You have to come up unless you'd rather sit down there. No I don't think so your honor. May it please the court. My name is Aaron Abel and I represent the appellants in this case and we ask that the court reverse for four basic reasons. First, no court has ever pierced the corporate veil of a multinational highly regulated public group of corporations like this who are regularly audited as well. Secondly, the courts do not hold individuals liable when they receive nothing from an alleged corporate transfer and in fact this court has held the contrary in a case under Illinois law. Forgive me for interrupting but I'd really like to get to this because one of the arguments that you make as to veil piercing is that if we're going to pierce the veil of a particular company that company has to have been undercapitalized and essentially a pawn from the beginning and what I have been trying to figure out is this. Why as a matter of logic is that right? In other words, what if a corporation is adequately capitalized properly observing all of the corporate formalities for some number of years and then some someone else some other entity acquires it and begins to use it as his or its personal pawn and piggy bank. Why can't we pierce the veil then regardless of what might have occurred earlier? Well essentially under Indiana law that's what the court has said but the court has also said that if a company undertakes a new business with a lot of additional risk then additional capitalization might be necessary and I also think one of the answers is that there might be other sorts of first off there would be other factors potentially available and the veil piercing test could still be met and secondly there might be other remedies if in fact money were taken out of the corporation so that's essentially the reason. But isn't there a fair amount of evidence that would support a finding that the Simmons were able to extract significant sums of money for their personal ends from those companies? No your honor and essentially it's important to distinguish which companies. The seller of the assets was IGF Corporation. The Simmonses were paid their salaries by Goran and not by IGF and in fact they did not increase their salaries after the purchase of the business from CCC. There was no evidence that the salaries were excessive and so it's in fact the seller of the assets IGF was under very close supervision from the Indiana Department of Insurance who had to approve any related party transactions, any transactions in excess of $10,000. But you know the district court certainly found that the overlap of the boards and officers, the mere lip service that seems to have been paid to the corporate formalities and the free transfer of funds among the corporations would reveal or did reveal that the separate corporations were separate corporations in name only. Again your honor I don't believe so. The courts have held that in fact the documentation of loans as opposed to simply using a corporation as a personal piggy bank is an indication that the corporations are actually separate. In addition to that fact again none of these loans came from IGF Corporation who was the seller of the assets and who was the party that allegedly made the fraudulent transfer. See I just can't, I'm trying so hard to see how these were distinct corporations rather than mere extensions of your clients. The evidence just seemed to be fairly compelling that given the commonality of shareholders, directors and officers, the shared corporate offices and simultaneous board meetings and that flow of funds from the corporations, the undercapitalization, when you put it all together I think it's very problematic. Again your honor, first Goran and Sig were both public corporations. They did both have independent board members. Goran was not undercapitalized. In fact the testimony on that was based completely on the public filings and they were filed on a consolidated basis as was required but they also reflected as a result of that liabilities that were not Goran's. But more importantly the insurance businesses were required to be kept rigorously separate by state law. Insurance companies must keep their capital separate. Their management agreements must be approved by state regulators and the evidence was that all of those things happened here. And again the kinds of acts that CCC alleges were dominance are the kinds of acts any majority shareholder can take with respect to a corporation and that alone is not the kind of dominance that the Indiana courts or other courts look for. Essentially what they're looking for is evidence that there really wasn't a corporation at all. And here again we have independent board members. We have public filings both on the state and federal level. We have public regulation on both the state and federal level that restricted very much the activities that could be undertaken and the activities that were undertaken. In addition under veil piercing one of the things that is critical is that the creditor have some sort of reliance. Here the creditor CCC knew exactly who it was dealing with when it sold its business. It knew the corporate structure. It in fact had pulled down the securities filings and so it was well aware of who it was dealing with and that is very much like this court's decision in Fusion Capital and the Second Services case. This is not a situation where you have an involuntary creditor like a tort creditor and it's not a case where the creditor was somehow fooled into thinking it was dealing with someone else or a company more substantial than the company in fact was. CCC knew exactly what it was dealing with, knew what the assets and liabilities were, knew what the management was and under those circumstances there's no inequity that requires veil piercing on behalf of the contract creditor. In addition to the errors with respect to the veil piercing on the fraudulent transfer point the courts interpreting the Uniform Fraudulent Transfer Act including this court in APS sports collectibles have consistently held that individuals are not liable merely by virtue of their officer and director positions. Well have you been able to cite any Indiana case that expressly rejected our court's dicta in DFS that individuals who directly participate in the fraudulent transfer may be held liable? In essence that's what She vs. Ye does which is a case that we've cited. I know but I'm trying to figure out how exactly does the Indiana Court of Appeals decision in She rule out the prospect of individual liability no matter what the evidence in a particular case shows because She held that a title company that did not knowingly participate in a fraud could not be held liable for an allegedly fraudulent transfer but I don't think that holding sheds any light on the liability of the Simmons defendants here. Here's why I believe it does your honor. This court's decision in DFS rested on the premise that the Indiana courts would equate the fraudulent uniform fraudulent transfer act with common law fraud and She explicitly rejected arguments based on common law fraud cases. And so in addition I believe the allegations in She were that the title company did have knowledge participated and benefited so again it's analogous to this case because the foundation of DFS was that individuals are liable for their own torts like a truck driver for example would be liable for an accident although his company is also liable and what She versus Ye said is essentially we're not dealing with these tort cases we are dealing with a statute and the statute says who can be liable and the people the statute says can be liable are the first transferee and subsequent transferees unless they give value and act in DFS and DFS I might add is inconsistent with and did not cite APS sports collectibles which was a square holding under the same uniform act identical statutory language and so again we believe a holding of this court is much more persuasive you even though it's under Illinois law then dicta of this court which was not well considered and the premise of which has been rejected by the Indiana court of appeals. Well the She case didn't really analyze the precise statutory language that we have that's implicated here under the fraudulent transfer claim. We've got not only the strict liability form of fraudulent transfer liability at play here we also have a finding by the district court that there was intentional fraud so you know there are a number of different statutory bases for finding a fraudulent transfer and clawing back the money and one of them is actual fraud and that's the finding that we have on the record here so why doesn't that take us outside the analysis of She and that case in any event said that there was insufficient facts pleaded on the basic fraud that was alleged so there's a bunch of reasons why that case came out the way it did so I'm not sure it's as strong as authority as you're making it out to be. Well I think a couple of reasons one the statutory language for liability and who can be liable is the same under both the strict liability and the intent to defraud provisions of the uniform fraudulent transfer act there is a section that is to be able to undo the transaction another is to get damages and the statute specifies who you can get damages from and you can get damages from the transferee not from the transferees officers and directors. Does the statute constitute an independent wrong or is it just a remedial statute? It is a statute that provides specifically when transfers can be undone. I don't know that I would describe it as a tort per se it's a statutory cause of action. It's a statutory cause of action and it is independent in that sense and it is in fact the only claim are claims under the statute that were pled for fraudulent transfer in this case and the only claims that the district court made findings on for fraudulent transfer were the statutory claims and the district court simply did not apply the statutory language in the manner this court did in the APS collectibles case. If the veil piercing findings of the district court are sound does this debate over transferee liability even matter? Because there is nothing that forecloses veil piercing under the fraudulent transfer act. The statute doesn't and you are right there are independent grounds however veil piercing simply doesn't meet the Indiana tests. I am positing that those findings are sound and that we affirm the veil piercing so if that is the case then the interpretation of the statute itself doesn't matter. In other words the scope of transferee liability doesn't matter. If we pierce the veil or affirm the district court's veil piercing as against the individual defendants then they are liable for the fraudulent transfer. Right? Well if you pierce the veil it wouldn't necessarily be for the fraudulent transfer they would be liable for. It would be the primary obligation. The contractual obligation same amount. For the damages. Correct. Under the statute as well as the breach of contract. Yes. If I may I would like to reserve the remainder of my time for rebuttal. Thank you very much. Good morning Mr. Hargrove. Good morning your honors. My name is James Hargrove as you know from the filing. I represent Connell Kayser the company. Just a few points about Mr. Abel's response. When he describes under the fraudulent transfer act the first transferee and the second transferee if the second transferee is not in good faith are liable. He forgot to mention the language about the first transferee or a person for whose benefit the transfer was made. And that is essentially what the DFS case I think stands for. It's interpreting Indiana law and finding that there is common law principle common law fraud principles and fraudulent transfer principles are similar and akin to each other in under Indiana law and that is the basis for why someone who directs controls and manipulates the transfer who is an officer or shareholder is also liable. I don't find that anywhere in the decision that the DFS case was talking about the alternative basis for transferee liability that is the direct beneficiary basis. It does not mention it. It's an interpretation of I think that is why common law fraud in Indiana is treated that way that officers and shareholders can be directly liable if they participated in direct. So purposes of the common law. We have a statutory claim here that has statutory terms that are defined in terms of who can be liable as a transferee. I think the reasoning of DFS is perfectly appropriate as the district court judge decided. In fact this thing was brought up three different times to him and he carefully reviewed DFS and reviewed the law of Indiana and made a determination that in each time. Also DFS is a certification decision. It's not controlling. Is there any case that applies Indiana law that expressly adopts our dictant DFS regarding individual liability? Your honor I think that is correct that there hasn't been a certification because of a settlement and there hasn't been a case that directly decided the issue that was certified. Obviously there are Indiana cases that form the basis for the DFS. So we would be getting out in front of the Indiana courts by holding transferee liability based on this participation theory that you are advancing? I think that you would not be getting. There is nothing that forecloses it? I understand your question your honor. I do not believe that that would be getting in advance of it because the reasoning is based on interpretations of what the Indiana courts have said about common law fraud and that fraud under those cases they are officers and directors. Fraud is an independent wrong. In the fraudulent transfer statute that is why I asked the question of your opponent about whether it codifies an independent wrong and a remedy or whether it is strictly a remedial statute that permits creditors to reach transferees to satisfy debts. It is hard not to say that it is a codification of common law in that the fraudulent transfer, fraudulent conveyances, bankruptcy law has been from time immemorial. Are those remedial devices as opposed to independent wrongs? They are debt collection devices and they require a showing of some species of fraud but there is also strict liability provisions in the uniform statute. That is correct. I think it is clearly a statutory cause of action but is it based on... Is it properly understood as a wrong plus a remedy or just a remedy? I think it is a wrong plus a remedy. Is there any authority for that construction of the Uniform Act? Your honor I cannot answer that one. I do not know. Is Gordon Simon's liability premise solely on his role as an officer or director in signing off on the transactions or did he in any respect play a role akin to Alan Simmons in suggesting or demanding a particular provision in the agreement with acceptance? Well, your honor, he was the chairman of the board. He was actively participating as chairman of the board. Alan Simmons was definitely the person who was doing the legwork on behalf of the corporations and was doing the personal negotiation on behalf of the corporations. He routinely reported to the board, told them that these proposals were ones made by the corporations and were not something that was demanded by acceptance. This was obviously the joint decision of the Simmons family. I want to take you somewhere else because as I recall you noted in your brief that a number of the arguments the defendants make on appeal were not ones that they made below. Correct. And could you highlight for us any important argument that the defendants are making for the first time on appeal because I do not recall you having made a waiver argument in your brief. That we did not make a waiver argument? I think we did. We did cite cases saying that this was raised for the first time in their main brief. There was also arguments that were raised for the first time in their reply brief that were not made in their main brief. Did you explicitly make a waiver argument? Yes, the cases were waiver cases that was waived. I do not know if it was repeated every time but at least the first time it would have been made that the cases would have been cited for that proposition. Which arguments would you cite as having been waived? Well there were a lot of them and as you indicated that point was made throughout the brief. The ones that jump in my head are the arguments made that certain policies, reinsurance treaties should be given weight. The ones that were no testimony in the lower court, never raised in their post-trial findings of proposed findings, it was never in any way raised down below. And so that is something that I think has been waived. They make arguments about, I am trying to think what it was, they have done a number of mathematical calculations in their reply brief that were not even made in their main brief. One saying that was with respect to what Dr. Driscoll testified when he calculated what the risk of reinsurance of 140% being hit was, they made some calculation with no basis in the record whatsoever and an argument based on it that you should not believe Dr. Driscoll because all the work that he did to come to this conclusion that would happen six out of every 10,000 cases, six out of every 10,000 years and even though Alan Simmons said that it would be very, very rare, that is what he told the board, it would be very rare for this to ever occur and it has not ever occurred. In their brief they argue now based on some mathematical calculation that their attorneys did that it actually would happen twice every 10 years. I don't know where it comes from, but it is certainly not based in the record. They probably noted it 10 times, I would say. I am trying to think which ones, they all didn't make a list of that. How did the asset commingling and the lack of independence among the boards escape the notice of the regulators for all these years? Well, that is a good question. For one thing, they were routinely misled as the evidence that we found out about through discovery in this case. It is not something you would read in a securities filing. They were misled, but on the other hand, the regulators such as in Florida did bring proceedings in 2001, 2002 and they got a judgment for $15 million for overpayment of fees, taking too much fees out of Superior Insurance Company, one of the three operating companies. Then finally, by 2002 or 2003, all three operating companies, the only three that were operating insurance companies that were regulated, were all put into rehabilitation proceedings and they have been liquidated. So, I mean, eventually they did, but the problem is it would have been nice if it happened earlier. But, you know, their role is really, the regulators' role is to not to look for... They don't look upstream. Pardon? They don't look upstream. They just look at the... were done right before the regulators were given a financial statement. So it would be hard for them to know who is doing what. One point that the defendants make is that Mr. McCarthy said he absolutely needed non-compete from SIG, S-I-G, and that he and acceptance wanted non-competes from anybody and everybody. Would you be kind enough to respond to that? Yes. The one where he said he really wanted it from SIG was a short memo that he sent to the Simmonses on May 23, 2001, which was the day of signing and execution of the agreement. That was obviously a post hoc rationalization. The agreement was signed on May 23rd. It had been negotiated in February, January or February. But perhaps more importantly, it isn't so wrong for them to want covenants not to compete from everybody, and you do that. If you're selling a company to the company's people associated with it, the owners, it would not be unusual to sign a covenant not to compete. That's part of your fiduciary duties to do that. But what's unusual is to say, oh, by the way, I want nine million bucks for that. That is really where it is wrong. That's why Conrad Black went to jail. You can't do that. You can't funnel money out of the business that's being sold, and then when you're a non-competing holding company, you're just a holding company for the company that is in competition. This all goes back to, you know, when are covenants not to compete valid? They're valid for 500 years, including, you know, starting with England. They were valid only if they're ancillary to protect the goodwill of the business sold or to protect customer relationships that the employee has. Those are the two basic things. So you can't just funnel money up to, you can't pay anybody not to compete. That's a section one restraint of trade under the antitrust laws. You just can't do that. It would be nice for someone to eliminate the competitors that way, but it's not legal. And that's exactly why all those Hollinger cases were decided by different judges. A bunch of them were in the Northern District of Illinois, but they were not. They were different judges. Decided you can't take money, if you're a holding company, out of the sale of the subsidiary. And besides, these people weren't able to compete anyway. They were insolvent. It sold their business. They didn't have the skilled people, people with the customer relationships, and with the knowledge of the prop insurance, which is a very unusual type of insurance, all were paid to go to acceptance, and it had retention and non-compete provisions in their employment agreement. Those payments, including their salary, was over a million dollars. I'd like to go back to a minute for the argument regarding the District Court's findings on piercing the veil, because it seems to me that the findings on the alter ego and piercing the veil analysis really subsume a lot of the other arguments and claims. If we were to decide that the District Court erred in that analysis, are there any of the other claims or other parties that you think would be released from liability? If the alter ego claims did not stand, any of them, or the fraudulent transfers did not stand at all? Is that what you're asking? I'm saying that if the findings regarding alter ego analysis are, if we find that that was an error, for example, is there any other party or claim that you would concede would therefore not have a basis? No. So there's an alternative basis? The fraudulent transfer is separate. It would definitely still stand. The breach of contract claims would still stand. It's just the alter ego would be changed. And on the breach of contract claim with respect to SIG, if there is no guarantor liability for SIG and if the alter ego analysis does not stand, is there still a way to reach SIG on the breach of contract claim? And if so, for how much of a liability? I think there would still be the fraudulent transfer claim because they were involved in that. But as far as breach of contract, I think the answer to that is yes. It's a little complicated. But the SIG was on the contract, and therefore we don't think it's a guarantor. It breached the contract. But aside from that, that was one element of the breach of contract damages. The other element, which had nothing to do with this, had to do with the payment for the obligation to pay for the year 2000 when the business was pooled. And Continental was entitled to and always had received in previous years its share of the gain. The part that was attributable to the CCC business that was pooled. And in 2000 that was not paid. The amount of that portion of the judgment, I think, was about $10 million. There was $5 million for that, for the 2000 reinsurance, and the interest, because it was so long ago, was another $5 million. Could you spend a moment talking about whether Granite Ray truly could have covered its risk for $200,000 because the defendants seem to believe that there was no possibility, or at least no real evidence that its risk could have been covered for such a small amount? Yes. There's several reasons why it could. First of all, the risk was never going to occur because six out of 10,000 years is very, very unusual. So you're not going to pay usually $3 million for that level. Now, if you're down below 140% at 90% or 110%, that's a totally different question, or 120% even. But 140%, it's just not going to happen. It's never happened, and Mr. Simmons told his board that it would never happen, essentially. I think he said one out of 100 years at most. That's what he wrote to the board. So any money that's just shifting money to Granite Ray, as far as you pick the $200,000, which is an interesting number because when Mr. McCarthy of acceptance was saying, okay, we don't care how much goes into which bucket as long as it's $40 million, he proposed, and this is clearly in writing, Granite Ray doesn't have the kind of surplus anyway to cover this if it was hit, but it's not going to get hit. Why don't we take them off the hook, and they keep $2.8 million for having no risk, and because they retrocede all risk to a reinsurer at our suggestion that we'll pay them $200,000. So $3 million will still be paid, but we'll pay the reinsurer $200,000. And Mr. Simmons came back. It's all in writing. He came back and said, well, we want $3 million because, again, there's no risk. Why put $200,000 off the table? I don't know if that answers your question, but also all the other experts, they have no witness to say what this should be valued at. They had no one even talk about policies at the trial. How do you value something that's worthless? Well, I guess that's a value. That value is zero. A sham reinsurance agreement. I mean, it has no real value when it's that high a risk. Thank you very much. Thank you. How many minutes left? Four. Thank you, Your Honor. There are a couple of things I want to address. With respect to waiver, we have not made new arguments. We have brought perhaps some additional facts out that are supported in the record to the court's attention. And with respect to whether the reinsurance treaty did or didn't carry risk, I think it's important, and this was CCC's Exhibit 16, that the prior year's reinsurance at the 150% level, which is a level higher, was given to unrelated companies largely and was at a .77% rate. If you applied that same rate to the $400 million in retained premiums in this transaction, you would get a premium in excess of $3 million. And there was testimony in the record, and Alan testified that the discussions with Mr. McCarthy were at a .8% level, but Mr. McCarthy wanted a flat fee and .8 as opposed to .77 because, again, it's a little closer to the risk at 140 than it would be at 150. But the point is that 150 treaty was not an insider treaty. It was a treaty that also involved third-party reinsurers, and they weren't giving away their reinsurance for $200,000. They were, in fact, demanding .77% of the retained premiums. I do want to say just a little bit with respect to Gordon and his executor, Robert Simmons. Gordon, really the only evidence of his participation were his votes on the boards of directors. That was it. There's no other evidence of his participation. The direct benefit argument that Mr. Hargrove attempted to make, the district court actually rejected that and said it was undisputed that they were not direct beneficiaries of the transaction. That's in the district court's conclusion, number 84. And he suggested the calculations with respect to Mr. Driscoll's testimony and demonstrating the problems with his testimony are not based in the record. In fact, they are. Mr. Driscoll testified to both gross loss ratios and ratios on net retained premiums, and the ratios that, according to his testimony, were somewhere between 65 and 68%. That is, from the gross loss ratio to the net retained premium ratio on the two years that he testified about was in that range. And given the other testimony he gave about loss ratios in excess of 200%, it's clear that the 140% level could be met. So there's something wrong with his calculation. And, in fact, he testified he never priced reinsurance. Tosh, who had priced reinsurance, says nobody prices it this way based on pure premium. And so, again, we've detailed a lot of these in our briefs, but there are serious problems with the expert testimony. Borghese, for example, said it was really, really, really important that Mr. McCarthy didn't think that SIG or Garan could get a reinsurance agreement. And, in fact, that's the opposite of his testimony. He said those companies we thought had more access to capital and, therefore, were more of a threat than IGF. So that's exactly why he paid for the non-competes. And there are a number of other examples, and, again, we've detailed those in our briefs concerning Mr. McCarthy's testimony. He had proposed a reinsurance treaty at one point that would have resulted in more than $30 million in premiums. Thank you very much. Thanks to all counsel. And the case will be taken under advice.